UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

SYN•X PHARMA, U.S.A., LLC,

    Plaintiff,

**03 - 80201**

v.

ROCHE DIAGNOSTICS, GmbH,
    a German corporation, and
ROCHE DIAGNOSTICS CORP.,
    an Indiana corporation,

    Defendants.

_____/

## COMPLAINT FOR DECLARATORY JUDGMENT
## AS TO PATENT INFRINGEMENT AND PATENT INVALIDITY

Plaintiff, SYN•X PHARMA, U.S.A., LLC, sues the Defendants, ROCHE DIAGNOSTICS, GmbH and ROCHE DIAGNOSTICS CORP., for relief under the Declaratory Judgment Act and complains as follows:

### JURISDICTION AND VENUE

1.      This is an action to declare the rights of the parties pursuant to the Federal Declaratory Judgment Act, 28 USC § 2201, and the patent laws of the United States, 35 USC § 271 et seq.

2.      This Court has original and exclusive subject matter jurisdiction of this cause pursuant to 28 USC § 1338(a).

3.      This Court has personal jurisdiction over the Defendants pursuant to F.S. 48.193(1)(a).

4.      Venue is proper in this district pursuant to 28 USC § 1391(b) and (d).

## PARTIES

5.      SYN•X PHARMA, INC., is a Canadian corporation with its business address at 1 Marmac Drive, Toronto, Ontario, Canada. It is a leading researcher in in the field of proteomics, the identification, quantification and analysis of proteins; it has developed a variety of advanced diagnostic tests through this science, including a blood test for the prognosis and diagnosis of congestive heart failure.

6.      SYN•X PHARMA, U.S.A., LLC is a Florida corporation with its business address at 4440 PGA Boulevard, Palm Beach Gardens, Florida . It is responsible for the regulatory approval, development, and commercialization in the U.S. of SYN•X PARMA'S NEXUS® Dx point of care diagnostic test for congestive heart failure.

7.      ROCHE DIAGNOSTICS is the global trade name for the diagnostics division of F.HOFFMANN-LA ROCHE, LTD., headquartered in Basel, Switzerland. It comprises the research, technology, and marketing arm of Hoffmann-LaRoche, a world leader in pharmaceuticals, and delivers its products worldwide through affiliates and regional representatives.

8.      ROCHE DIAGNOSTICS, GmbH. is a German corporation with its business address at Sandhofer Strasse 116, Mannheim, Germany. It is the exclusive worldwide licensee of various patents, discussed further below, including U.S. Patent No. 5,786,163 (Exhibit "A" attached). Pursuant to its patent license, ROCHE sells a clinical diagnostic test for congestive heart failure, including in the U.S., under the trademark ELECSYS® proBNP immunoassay.

9.      ROCHE DIAGNOSTICS CORP. is an Indiana corporation with its business address at 9115 Hague Road, Indianapolis, Indiana. It is also a licensee of the '163 patent, as an affiliate of Roache Diagnostics, GmbH, and is the U.S. distributor for ROCHE DIAGNOSTICS, GmbH's proBNP immunoassay. It is registered to do business in the State of Florida.

10.     MEDINNOVA SF is a non-profit organization owned by the Norwegian Government, with its business address at Rikshospitalet, 0027 Oslo, Norway. MEDINNOVA assists in patenting, development, and commercialization on behalf of the Norwegian National Hospital, and is the owner of patents issued to Christian Hall, in various countries, directed to a BNP antibody and method of immunoassay. These patents are the subject a patent license agreement between MEDINNOVA and ROCHE DIAGNOSTICS, GmbH, attached hereto as Exhibit "B". Based upon the worldwide exclusivity provided by this license, even as against MEDINNOVA, and extending through the life of the patent, it is believed that MEDINNOVA'S rights and interests are fully represented by ROCHE DIAGNOSTICS, GmbH in this litigation. Upon information and belief, MEDINNOVA is not a necessary party to this action, however, a copy of this action is being mailed to MEDINNOVA, at the address provided for "Notices" in Exhibit "B".

## BACKGROUND

11.     Aided by achievements in sequencing the human genome, the study and cataloguing of proteins has led to the use of protein markers (biomarkers) as a means of simply and quickly predicting and diagnosing certain diseases, through the testing of biological fluids which reflect cell injury or responsive adaptations in the body's organs.

12.     In 2001, SYN•X PHARMA, INC. developed a diagnostic and prognostic blood test for congestive heart failure (CHF). In late 2001, the company sent a distributor fact sheet to ROCHE DIAGNOSTICS and other prominent diagnostic companies as part of its efforts to partner with other companies active in the bio-diagnostic field.

13.     Communications were established with ROCHE DIAGNOSTICS U.S.A. and ROCHE DIAGNOSTICS' headquarters in Basel, Switzerland, which resulted in meetings with and presentations to executives of ROCHE DIAGNOSTICS, in Indianapolis and Toronto, in March

2002. SYN•X's efforts were directed toward seeking a worldwide partner for a point of care test for four diagnostic products under its Nexus Dx trademark, including its CHF diagnostic. These efforts included SYN•X providing information under a Confidential Disclosure Agreement, including a portion of SYN•X's own U.S. Patent Application, addressing its CHF testing.

14.     In November, 2002, SYN•X attended the Medica 2002 Trade Fair in Dusseldorf, Germany, at which it displayed its CHF test, and other diagnostic products.   Shortly thereafter, ROCHE DIAGNOSTICS, GmbH filed a suit for emergency injunctive relief under the patent laws of Germany, followed by a related patent infringement action in a separate German court.

15.     The German actions are based upon European Union Patent No. EP 0 648 228 (Exhibit "C" attached). Though separate examinations as between the U.S. and the European Union resulted in narrower patent claims in the U.S., both patents address the same invention by Christian Hall.

16.     Following the institution of ROCHE'S German action, the parties met in Germany, which resulted in a further evaluation of SYN•X's test in Toronto in February, 2003.   At that meeting, SYN•X disclosed further information regarding its CHF test.

17.     In a telephone call to SYN•X's Chief Executive Officer following the meeting in Toronto, ROCHE advised that it intended to continue with the German action. It also threatened to institute patent infringement litigation in the U.S. and Canada. Exhibit "B" shows that the Hall patent is in force in both the U.S. and Canada.

## COUNT I

## DECLARATION OF RIGHTS AS TO NON INFRINGEMENT OF THE '163 PATENT

18.     The Plaintiff seeks a declaration of the rights of the parties under 28 USC § 2201 as

to patent infringement and re-alleges paragraphs 1 through 17 above.

19.     SYN•X PHARMA, U.S.A., LLC  "...makes, uses or sells..." its Nexus Dx point of care CHF test in the U.S., pursuant to 35 USC § 271.  An actual controversy exists between the parties, who are competing in the general field of diagnostic products for congestive heart failure testing.

20.     The threat of litigation is clear and, because of the significant investment made by the Plaintiff, this litigation threat must be addressed in order to prevent the Defendants from creating a lack of confidence in the marketability of the Plaintiff's product.

21.     The Plaintiff is entitled to be able to conduct its business in an atmosphere free of litigation threats and, therefore, chooses to establish the rights of the parties through the Declaratory Judgment Act.

22.     SYN•X's CHF test is an ELIZA assay. a so called sandwich assay utilizing two antibodies.  The Plaintiff's CHF test does not infringe the claims of the '163 patent, as properly construed, either literally or under the doctrine of equivalents.

## COUNT II

## DECLARATION OF RIGHTS AS TO INVALIDITY OF THE '163 PATENT

23.     The Plaintiff seeks a Declaration of the Rights of the Parties under 28 USC § 2201 as to patent invalidity, and re-alleges paragraphs 1-22 above.

24.     The '163 patent is invalid under 35 USC § 102, including §§ (a) and (b) thereof, in view of the patent issued to Seilhamer, et al. on May 19, 1992, U.S. Patent No. 5,114,923.  During the prosecution of the '163 patent, the patent examiner did not examine the '923  patent which, if known to the examiner, would have resulted in a rejection of relevant claims of the '163 patent.

Other publications, if known, would also have affected the prosecution of the '163 patent

25.    The '163 patent is also invalid in view of prior art which was in fact examined during the prosecution of the '163 patent.

26.    The '163 patent is invalid under 35 USC § 103 in view of the patent issued to Seilhamer, et al., and other prior art which was addressed by the examiner during the prosecution of the '163 patent.

27.    The '163 patent is invalid under 35 USC § 112, as not enabled by the specification thereof, including the lack of a deposit of biological material pursuant to applicable international treaty. The invention claimed in the '163 patent involves a biological material which words alone cannot sufficiently describe how to make and use the invention in a reproduceable manner.

28.    The '163 patent is further invalid because the specification cannot does not contain an adequate written description of the invention showing that the inventor possessed the invention at the time of filing.

WHEREFORE, the Plaintiff prays:

a.    That this court declare that the Plaintiff's point of care test CHF Diagnostic Test does not infringe the claims contained in U.S. Patent No. 5,786,163.

b.    That this court declare that U.S. Patent No. 5,786,163 is invalid.

c.    Such other relief as may be deemed appropriate.

Respectfully submitted,

McHALE & SLAVIN, P.A.
4440 PGA Blvd., Suite 402
Palm Beach Gardens, FL 33410
Telephone (561) 625-6575
Facsimile (561) 625-6572


Edward F. McHale
Florida Bar No. 190300

# EXHIBIT "A"

US005786163A

# United States Patent [19]

## Hall

[11] Patent Number: 5,786,163

[45] Date of Patent: Jul. 28, 1998

[54] **BNP ANTIBODY AND IMMUNOASSAY USING IT**

[75] Inventor: **Christian Hall**, Snarøya, Norway

[73] Assignee: **Medinnova SF**, Oslo, Norway

[21] Appl. No.: **338,558**

[22] PCT Filed: **Jun. 2, 1993**

[86] PCT No.: **PCT/GB93/01173**

§ 371 Date: **Nov. 21, 1994**

§ 102(e) Date: **Nov. 21, 1994**

[87] PCT Pub. No.: **WO93/24531**

PCT Pub. Date: **Dec. 9, 1993**

[30]        **Foreign Application Priority Data**

Jun. 3, 1992 [GB] United Kingdom .................. 9211686

[51] **Int. Cl.6** .............................................. G01N 33/53
[52] **U.S. Cl.** ...................... 435/7.92; 435/7.93; 435/7.94;
435/7.95; 435/975; 435/518; 530/387.9;
530/388.1; 530/388.24
[58] **Field of Search** ...................... 435/7.1, 7.9, 7.92,
435/7.93, 7.94, 7.95, 975; 436/518, 524,
528, 530, 534; 530/403, 399, 402, 810,
812, 811, 387.9, 388.1, 388.24, 389.1, 389.2

[56]            **References Cited**

FOREIGN PATENT DOCUMENTS

0385476   9/1990   European Pat. Off

OTHER PUBLICATIONS

Japanese Patent Abstract No. 92–053618.
Chemical Abstract No. 114: 240736K.
Mukoyama et al., J. Clin. Invest. 87(4): 1402–1412, 1991.

Sudoh et al., Nature 332:78–81, 1988.
Sudoh et al., BBRC 159: 1427–1434, 1989.
Staros et al., Analyt. Biochem. 156: 220–222, 1986.
Chemical Abstract No. 116(19): 192485v.
Chemical Abstract No. 115(17): 174663b.
Chemical Abstract No. 115(5): 43473s.
Chemical Abstract No. 114(17): 158509.
Sherry et al., Biochem Biophys Res. Comm. 173(3):1072–1078, Dec. 31, 1990.
Jue et al., Biochemistry, 29:8371–8377, 1990.
Cseh et al., Journal of Biological Chemistry, 264(27):16256–16260, 1989.
Kriegler et al., Cell, 53:45–53, 1988.
Voller et al in "Alternative Immunoassays" Collins et al. eds., 1985 by John Wiley and Sons Ltd. pp. 77–86.
Hino et al., Biochemical and Biophysical Research Communications, 167(2):693–700, 1990.
Mukoyama et al., Journal of Clinical Investigation, 87(4):1402–1412 Apr. 1991.

Primary Examiner—Paula K. Hutzell
Assistant Examiner—Patricia A. Duffy
Attorney, Agent, or Firm—Pennie & Edmonds

[57]            **ABSTRACT**

The present invention provides antibodies for use in a method of immunoassay being antibodies specific to the polypeptide consisting of amino acids 1–76 (SEQ ID NO:1) of N-terminal brain natriuretic factor BNP(1–76). Also provided are methods and kits for the diagnosis or prognosis of conditions in which BNP(1–76) is a diagnostic or prognostic indicator, such as heart failure or hypervolemia.

**13 Claims, 1 Drawing Sheet**



FIG. 1

5.786.163

| 1 | 2 |

# BNP ANTIBODY AND IMMUNOASSAY USING IT

This invention relates to the N-terminal section of Brain Natriuretic Peptide Prohormone. BNP(1–76)(SEQ ID NO:1) and the use of antibodies against this in immunoassays in biological fluids for the purpose of biological research and medical diagnosis, for example of heart failure or hypervolaemia.

Heart failure is a common clinical syndrome especially among elderly people. Population surveys indicate that the condition affects about 2% of the total population in the western world. The syndrome usually presents itself with an insidious onset with unspecific symptoms such as dyspnea on exertion, fatigue and peripheral oedemas. To establish the diagnosis the physician usually must either rely on his clinical experience or refer the patient to a cardiological center for echocardiography, radionuclide scanning, exercise testing or catheterization.

Heart disease represents a significant drain on health resources in many major countries, and whilst an early diagnosis may help in controlling the condition and preventing rapid progression to severe heart failure, it would obviously be preferable to be able to identify those patients in which heart failure is likely to occur before it actually does so, ie. to prognose rather than diagnose.

Unfortunately, there are at present no completely satisfactory methods for predicting the likelihood of heart failure. Problems frequently observed with such methods are insufficient accuracy and sensitivity, and the disadvantages of the necessity for expensive equipment requiring specially trained personnel (eg. in echocardiography). A need therefore exists for a simple method of accurately and sensitively, not only diagnosing, but also predicting the likelihood of onset of heart failure.

Whilst heart failure can be defined as a symptomatic risk ie. an overt disease or syndrome, patients may frequently pass through a state of asymptomatic cardiac dysfunction ie. a sub-clinical condition without overt symptoms, before heart failure manifests itself. However, we have now found that not all patients having cardiac dysfunction go on to develop severe heart failure, and that the risk of heart failure for some such people is much greater than for others. To be able to identify those people at particular risk of developing heart failure in order that they may be caught and treated before heart failure occurs would be of great clinical importance; at the moment existing treatments eg. ACE inhibitors are very expensive and it is not cost-effective for everyone to be treated to try to prevent the onset of heart failure.

Brain Natriuretic Peptide (BNP) is a polypeptide originally isolated from porcine brain by T. Sudoh and coworkers (Nature 1988; 332: 78–81). After cloning and sequence analysis of CDNA coding for the peptide (T. Sudoh BBRC 1989; 159: 1427–34) human BNP was shown to be produced in the human heart. Human Brain Natriuretic Peptide is believed to be produced in cardiac myocytes as a prohormone (proBNP or BNP(1–108)). proBNP consists of 108 amino acids and is split, before or during secretion, at amino acids Arg76—Ser77 into BNP and the N-terminal part of the prohormone, BNP(1–76)(SEQ ID NO:1), that is the peptide consisting of the first 76 amino acids from the N-terminal of proBNP.

The BNP(77–108) plasma concentration is increased in patients suffering from heart disease leading to heart failure. The cardiac monocytes secrete another factor, namely atrial natriuretic factor (ANF) but the secretory response to heart failure or incipient heart failure seems to be much larger in the BNP system compared to the ANF system (Mukoyama et al. J Clin Invest 1991; 87: 1402–12).

The present invention is based on the concept that human BNP(1–76)(SEQ ID NO:1), due to a long half-life as compared with BNP hormone itself and high initial concentration, is a particularly good diagnostic indicator or predictor of heart disease and also of hypervolaemia.

Human BNP(1–76)(SEQ ID NO:1) may thus be used to provide the basis of either a diagnostic or a prognostic test for heart failure, primarily in the biosynthesis of antibodies for use in such a test but also as competing antigen in competitive binding immunoassays. For such use in making antibodies BNP(1–76)(SEQ ID NO:1) or an antigenic fragment thereof may advantageously be conjugated to an immunogenic protein or peptide such as PPD, a protein derivative of tuberculin, Keyhole Limpet Haemocyanin or bovine serum albumin.

Thus human BNP(1–76)(SEQ ID NO:1) or an antigenic fragment thereof or polypeptide extension thereof lacking BNP activity and having at least one antigenic epitope of human BNP(1–76)(SEQ ID NO:1), conjugated to one or more immunogenic polypeptides, constitutes one aspect of the present invention; these polypeptides may be used to make either polyclonal or monoclonal antibodies specific to BNP(1–76)(SEQ ID NO:1). Such monoclonal and polyclonal antibodies constitute two further aspects of the invention.

According to a still further aspect of the invention we provide a method of immunoassay for human BNP(1–76)(SEQ ID NO:1) or an antigenic fragment thereof or polypeptide extension thereof lacking BNP activity wherein the primary binding partner therefor is a monoclonal or polyclonal antibody according to the invention. Methods of immunoassay are of course well known in the art eg. RIA, ELISA, fluorescence immunoassay (FIA) or dry chemistry test strip immunoassays. Such an immunoassay will, in general, use a monoclonal or polyclonal antibody according to the invention in immobilised form, e.g. on microtitre plates, membranes or beads, to isolate the target BNP(1–76) compound. In a sandwich assay, the bound antigen may be labelled using additional soluble antibody according to the invention, which may be monoclonal or polyclonal and which may either carry a label or, more conveniently, may itself be labelled subsequently by reaction with a secondary antibody carrying a label.

Thus, if the primary antibody according to the invention is raised in mice or rabbits, the labelled secondary antibody may be an anti-mouse or anti-rabbit antibody.

Suitable labels include radionucleides, fluorescent substances eg. europium based fluorogens, enzymes, for example as used in ELISA systems employing automated hybrid methods or dyes or coloured particles such as colloidal gold.

Alternatively, a competitive binding assay may be used, wherein a known quantity of labelled human BNP(1–76) (SEQ ID NO:1), or antigenic fragment or inactive extension thereof, is added to the analyte solution and contacted with a limited quantity of the immobilised monoclonal or polyclonal antibody, whereby the amount of labelled antigen which is immobilised is inversely proportional to the amount of target antigen present in the analyte.

The invention thus extends to labelled forms of human BNP(1–76)(SEQ ID NO:1) or antigenic fragments or polypeptide extensions thereof lacking BNP activity and to labelled forms of the antibodies of the invention.

The invention also comprises a kit for immunoassay of human BNP(1–76)(SEQ ID NO:1) or an antigenic fragment or polypeptide extension thereof lacking BNP activity comprising:

5,786,163

3

(a) a monoclonal or polyclonal antibody according to the invention in immobilised form and, at least one further component selected from;

(b) a labelled sample of BNP(1–76)(SEQ ID NO:1) or an antigenic fragment or polypeptide extension thereof lacking BNP activity;

(c) said monoclonal or polyclonal antibody in non-immobilised form;

(d) a labelled secondary antibody specific to said antibody (c).

Such an immunoassay and kit may be used in research into related biological systems as well as for diagnosis or prognosis of conditions wherein the human BNP(1–76) (SEQ ID NO:1) level in body fluids is a diagnostic or predictive indicator.

The invention also comprises a method of diagnosis or prognosis of a condition in which the concentration of human BNP(1–76)(SEQ ID NO:1) or an antigenic fragment or polypeptide extension thereof lacking BNP activity is a diagnostic or predictive indicator, wherein a body fluid of a patient is subjected in vitro to immunoassay to detect or assay the presence or quantity therein of human BNP(1–76) (SEQ ID NO:1).

We have recently found that another natriuretic factor namely pro-ANF, and in particular N-terminal pro-ANF, can serve as an indicator of risk of heart failure in patients lacking overt symptoms of heart failure. The level of pro-ANF in body fluids can be directly related to the risk of heart failure, predominantly related to increased atrial pressure. In contrast, BNP(1–76)(SEQ ID NO:1) is predominantly an indication of a heart condition related to increased ventricular pressure. Human BNP(1–76)(SEQ ID NO:1) as an antigenic fragment or inactive polypeptide extension thereof can also be used to assess risk of heart failure in addition to its use in diagnosis of actual heart failure. Furthermore, assay of both N-terminal pro-ANF and BNP(1–76)(SEQ ID NO:1) in body fluids can assist in determining whether atrial or ventricular pressure is concerned.

Thus, the immunoassay can be used in the monitoring of heart failure treatment. Such treatment is aimed at reducing the hypervolemia and excessive vasoconstriction seen in heart failure by the administration of diuretics and vasodilators. By decreasing the pressure in the cardiac chambers such treatment will lower cardiac production of BNP(1–76) (SEQ ID NO:1). The resultant decrease in plasma BNP (1–76) concentration serve to inform the physician of a significant drug effect. On the contrary, an increase in plasma BNP(1–76) indicates that an adjustment of dosage might be necessary.

Although less well documented at this time human BNP(1–76)(SEQ ID NO:1) may also be used as a diagnostic tool in the diagnosis of hypervolemia without heart failure. The immunoassay therefore has potential use also in the inhospital intensive care setting where monitoring of volume status is essential.

The body fluid on which the immunoassay is performed may be any body fluid in which the human BNP(1–76)(SEQ ID NO:1) is located, but conveniently will be plasma or serum. In some cases it may be convenient to extract the peptide, or otherwise treat the sample prior to assay.

The human BNP(1–76)(SEQ ID NO:1) peptide or an antigenic or immunogenic fragment thereof may be produced by synthesis from its constituent amino acids or by assembly of pre-synthesised blocks of amino acids using techniques well known in the art. Where labelled material is required, the label may be introduced by standard techniques.

4

For the purpose of raising monoclonal or polyclonal antibodies, the human BNP(1–76)(SEQ ID NO:1) or antigenic fragment thereof may be conjugated to an immunogenic protein or peptide, for example PPD, a protein derivative of tuberculin, eg. using 1-ethyl-3-(3-dimethylaminopropyl)carbodiimide according to the method of Staros et al (Analyte Biochem 1986; 156: 220–222).

The antibodies of the invention may be made by injecting a host animal, eg. a mouse or rabbit, with the BNP antigen of the invention, advantageously a conjugate with an immunogenic protein as described above, to provide either a serum containing polyclonal antibodies or spleen cells for conversion to hybridomas or immortalised cell lines producing monoclonal antibodies.

BRIEF DESCRIPTION OF THE DRAWINGS

The following Examples are given by way of illustration only with reference to the accompanying drawing in which:

FIG. 1 shows a standard curve for immunoassay for BNP(1–76) using synthetic BNP(47–64) as immunogen, standard and tracer, and polyclonal rabbit antibody. (Abscissa shows BNP(47–64) pmol/l; ordinate shows % binding (B/B(O))).

EXAMPLE 1

Production of Monoclonal Antibody Against BNP (1–76)

1) Conjugation

Three synthesized fragments of BNP(1–76)(SEQ ID NO:1): BNP(1–21), BNP(22–46) and BNP(47–64) were acquired from Peninsula laboratories and conjugated to PPD (protein derivative of tuberculin) according to Staros et al (Analyt Biochem 1986; 156: 220–222).

2) Immunization

Balb C mice, preimmunized with BCG antigen were utilized. The mice received a 50 microgram mixture of the three conjugates in 200 μl of Freunds incomplete adjuvant. The mixture was given in 2×200 μl injections on 2 occasions 2 weeks apart. 2 weeks after the last injection 50 μg of conjugate mixture in saline was injected intraperitoneally.

3) Fusion

3 days after intraperitoneal immunization mouse splenic cells were fused with SP 2/0 myeloma cells and the resultant hybridomas selected in HAT medium. The suspension of hybridomas was distributed in 960 wells in Dulbeccos medium enriched with 10% human endothelial cell supernatant.

4) Screening

Method 1

Costar microtiter plates were coated with a mixture of the synthetic BNP peptide sequences (0.5 μg/ml). Supernatants were then added and binding of antibody from supernatants was screened by ELISA through the addition of anti mouse IgG conjugated to horseradish peroxidase enzyme followed by substrate solution (OPD).

Method 2

An alternative method of screening is to coat Greiner microtiter plates with goat anti mouse IgG (1.0 μg/ml). Supernatants are then added and incubated. Biotinylated synthetic BNP peptide sequences are added and the ability of supernatants to bind peptide are screened by ELISA through the addition of streptavidin-conjugated horseradish peroxidase enzyme followed by substrate solution (OPD).

5) Cloning

Hybridomas producing antibodies to the peptide mixture were cloned and subcloned in two runs. Clone 1C7 was

| 5 | 6 |

shown to react with peptide sequence BNP(47–64). This clone was grown and the supernatant utilised in immunoassay for BNP(1–76).

## EXAMPLE 2

### Immunoassay for BNP(1–76)(SEQ ID NO:1)

The 1C7 antibody can be utilised in various types of immunoassays for BNP(1–76)(SEQ ID NO:1). These include

a) Radioimmunoassay (RIA)

b) Europium Fluorescence immunoassays (FIA)

c) Enzyme linked immunosorbent assays (ELISA) including automated hybrid methods running on micro titer plates or membranes

d) Various dry-chemistry test strip immunoassays

The following is an example of a sandwich ELISA.

Costar microtiter plates are precoated with the 1C7 antibody. Sample or standard is added to the wells and after 2 hours of incubation the wells are washed and a secondary antibody (polyclonal or monoclonal) towards BNP(1–76) (SEQ ID NO:1) is added. Again after 2 hours a horseradish peroxidase-labelled anti mouse (rabbit) antibody is supplied and finally after the addition of O-phenylene-diamine substrate the colour is read in a platereader.

## EXAMPLE 3

### Immunoassay for BNP(1–76) Utilizing Polyclonal Rabbit Antibody

A synthetic peptide subsequence of BNP(1–76)(SEQ ID NO:1), in this case BNP(47–64), was conjugated to PPD according to Staros et al., (Supra). Rabbits were BCG vaccinated and then repeatedly immunized with the conjugated peptide.

Iodination ($^{125}$I) of synthetic BNP(47–64), with a tyrosine group added at the N-terminal end, was done by the chloramine-T method as follows:

### Chloramine-T Method

1) 5 µg of the synthetic peptide was reconstituted with 20 µl sodiumphosphate buffer (0.25M, pH 7.5).

2) Approximately 5 µl of $^{125}$-I was added (0.5 mCi).

3) 5 µl of chloramine-T (1 mg/ml) was added and incubated for 45 seconds.

4) 5 µl of sodiummetabisulphite (1 mg/ml) was added and incubated for 45 seconds.

5) The mixture was then fractionated on a column with Sephadex G10.

6) The fractions were counted with a gamma-counter, and the fraction/fractions with highest counts per minute (cpm) were selected as tracer for use in the RIA methods.

Sample or standards (BNP(47–64)), together with tracer (iodinated BNP(47–64)) and polyclonal antibody from rabbit serum, are mixed in polystyrene assay tubes. After 48 hours of incubation at 4° C., normal serum from rabbit and goat anti-rabbit IgG are added. After 2 hours of incubation, polyethyleneglycol (PEG) is added and the samples are centrifuged. The supernatant is removed and the counts per minute (cpm) in precipitate are measured with a gamma-counter. An example of a standard curve obtained by this type of assay is shown in FIG. 1.

---

SEQUENCE LISTING

( 1 ) GENERAL INFORMATION:

   ( i i i ) NUMBER OF SEQUENCES: 1

( 2 ) INFORMATION FOR SEQ ID NO:1:

   ( i ) SEQUENCE CHARACTERISTICS:

      ( A ) LENGTH: 76 amino acids

      ( B ) TYPE: amino acid

      ( D ) TOPOLOGY: unknown

   ( i i ) MOLECULE TYPE: protein

   ( x i ) SEQUENCE DESCRIPTION: SEQ ID NO:1:

```
His  Pro  Leu  Gly  Ser  Pro  Gly  Ser  Ala  Ser  Asp  Leu  Glu  Thr  Ser  Gly
1                    5                   10                  15

Leu  Gln  Glu  Gln  Arg  Asn  His  Leu  Gln  Gly  Lys  Leu  Ser  Glu  Leu  Gln
           20                       25                      30

Val  Glu  Gln  Thr  Ser  Leu  Glu  Pro  Leu  Gln  Glu  Ser  Pro  Arg  Pro  Thr
           35                       40                      45

Gly  Val  Trp  Lys  Ser  Arg  Glu  Val  Ala  Thr  Glu  Gly  Ile  Arg  Gly  His
      50                       55                      60

Arg  Lys  Met  Val  Leu  Tyr  Thr  Leu  Arg  Ala  Pro  Arg
65                   70                   75
```

5,786,163

7

I claim:

1. An antibody composition comprising an antibody which specifically binds to a polypeptide consisting of amino acids 1–76 of the N-terminal of human pro-brain natriuretic factor (BNP(1–76)(SEQ ID NO:1)).

2. The antibody composition as claimed in claim 1 which comprises a monoclonal antibody.

3. The antibody composition as claimed in claim 1 which comprises a polyclonal antibody.

4. The antibody composition as claimed in claim 1 carrying a label.

5. The antibody composition as claimed in claim 4 in which the label is a radionuclide, a fluorescent substance, an enzyme, a dye or coloured particles.

6. The antibody composition of claim 1, wherein the antibody is immobilized on a solid support.

7. A method of immunoassay for BNP(1–76), (SEQ ID NO:1), which comprises:

(a) contacting a body fluid from a patient with a primary antibody according to claim 1 to form a primary antibody-BNP(1–76)(SEQ IS NO:1) complex; and

(b) detecting the formation of said complex.

8. The method as claimed in claim 7 in which the primary antibody is immobilized on microtitre plates, membranes or beads.

9. The method as claimed in claim 8 in which said detecting comprises contacting said complex with a second antibody which binds BNP(1–76)(SEQ ID NO:1) to form a second complex comprising a primary antibody-BNP(1–76) (SEQ ID NO:1)-secondary antibody and detecting the formation of said second complex to provide a sandwich assay.

8

10. The method as claimed in claim 7 wherein said primary antibody is immobilized and wherein said contacting comprises first adding a known quantity of labelled human BNP(1–76)(SEQ ID NO:1) or a labelled antigenic fragment thereof to the body fluid in solution to provide a competitive binding assay.

11. A labelled human BNP(1–76)(SEQ ID NO:1) or a labelled antigenic fragment thereof.

12. A kit for immunoassay of human BNP(1–76)(SEQ ID NO:1) lacking BNP activity comprising:

(a) an antibody according to claim 1 in immobilized form and, at least one further component selected from the group consisting of:

(b) a labelled sample of human BNP(1–76)(SEQ ID NO:1) or an antigenic fragment thereof lacking BNP activity;

(c) an antibody according to claim 1; and

(d) a labelled secondary antibody which specifically binds to an antibody according to claim 1.

13. An in vitro method of diagnosis or prognosis of heart disease comprising:

(a) contacting a body fluid from a patient with a primary antibody according to claim 1 to form a primary antibody-BNP(1–76)(SEQ ID NO:1) complex; and

(b) detecting the formation of said complex to determine the level of BNP(1–76)(SEQ ID NO:1) in the body fluid wherein an increased level of BNP(1–76)(SEQ ID NO:1) as compared to normal individuals is indicative of a diagnosis or prognosis of heart disease.

* * * * *

# EXHIBIT "B"

CLIFFORD CHANCE PÜNDER
Roche Diagnostics GmbH ./.
SynX Pharma

# LICENSE AGREEMENT

between

**Roche Diagnostics GmbH**
Sandhofer Str. 116
68305 Mannheim
Federal Republic of Germany

(hereinafter referred to as "RDG")

and

**Medinnova SF**
Rikshospitalet
0027 Oslo
Norway

(hereinafter referred to as "Medinnova")

RECITALS

WHEREAS,    Medinnova has developed the technology to measure N-terminal pro brain natriuretic peptide with monoclonal antibodies which may serve as a marker for heart failure, and Medinnova owns all intellectual property rights (including all related patents and patent applications) and also possesses certain confidential know-how and information in respect of the aforementioned technology as described in Annex I.

WHEREAS,    Medinnova and RDG have entered into an exclusive Option Agreement dated 21. August 1997 (hereinafter referred to as "Option Agreement") by which Medinnova has offered RDG an opportunity to evaluate the above-mentioned peptide and all related know-how and information in order to assist RDG in determining whether RDG is interested in exercising its option to acquire an exclusive world-wide license to use such peptide and related know-how and information to develop and commercialise related diagnostic, research and analytical applications.

WHEREAS,    Medinnova and RDG have agreed to amend the License Agreement attached to the Option Agreement and to enter into this License Agreement.

THE PARTIES HEREBY ENTER INTO THE FOLLOWING LICENSE AGREEMENT AND AGREE AS FOLLOWS:

## Article 1
## Definitions

1.1    **"Affiliate(s)"** of either party shall mean any corporation, partnership or organisation which such party directly or indirectly controls, is controlled by or is under common control with. For the purpose of this Agreement, "control" shall mean the holding of 50 % or more of the voting stock or other ownership interest of the corporation or other business organisation concerned. Whereas Genentech Inc., 1 DNA Way, South San Francisco, California 94080-4990, USA, shall not be deemed to be an Affiliate of RDG, provided however, that the said company's Third Party position does not in any way weaken Medinnova's rights according to this Agreement.

1.2    **"Combination Product"** shall mean a Licensed Product sold in combination with any other products and/or services, whether packaged together or separately, in particular a Licensed Product designed to also measure other parameters, whether packaged together or separately, if such Licensed Product and such other products and/or services are offered for sale at a one unit price.

1.3    **"Distributor(s)"** shall mean the distributors appointed by RDG in the Territory for the marketing, sales and/or promotion of the Licensed Products.

1.4     **"Effective Date"** shall mean the date of execution of this License Agreement by both parties hereto.

1.5     **"Exclusive"** shall mean that a right which is granted to RDG must not be granted to, or used or executed by, any person or entity (including but not limited to Medinnova or its Affiliates) other than RDG, RDG's Affiliates and/or sub-licensees.

1.6     **"Improvements"** shall mean substantial developments, discoveries and/or inventions, whether or not patentable, and in particular technical refinings, technological know-how, additions, ameliorations, amendments and/or modifications which improve or otherwise offer advantages in respect of the development, use and/or performance and/or manufacture of the Licensed Products and/or the Licensed Technology and/or the Information.

1.7     **"Information"** shall mean any and all know-how, data, specifications, samples, manufacturing instructions and/or other information, whether of a technical, scientific or any other nature whatsoever, relating to pro BNP.

1.8     **"License"** shall mean an Exclusive license in favour of RDG in accordance with Article 2.

1.9     **"License Agreement"** shall mean this agreement including the annexes hereto.

1.10    **"Licensed Field"** shall mean all diagnostic, research and analytical applications of pro BNP.

1.11    **"Licensed Products"** shall mean any and all diagnostic, research and analytical assays related to pro BNP and/or the Licensed Technology for the purpose of application in the Licensed Field.

1.12    **"Licensed Technology"** shall mean technology based on or related to pro BNP to detect heart failure, including any and all Information and Proprietary Rights, including any Improvements thereof, whether or not in the public domain.

1.13.1  **"Net Sales"** shall mean

1.13.1.1 the amount actually invoiced by RDG for sales of the Licensed Products in the Territory to Third Parties; or

1.13.1.2 in the event that RDG enters any sublicensing arrangements relating to the Licensed Products, the amount actually received by RDG from the sublicensees thereunder; or

1.13.1.3 in the case of sales of Licensed Products by RDG to its Affiliates or Distributors in the Territory, the amount actually invoiced by RDG for such sales of Licensed Products multiplied by a factor of 1.83

less, in respect of each of clauses 1.13.1.1, 1.13.1. 2 and 1.13.1.3:

1.13.2.1 value-added or similar taxes or excises;

1.13.2.2 any governmental charges imposed in any country within the Territory upon the importation and/or sale of the Licensed Products; and

1.13.2.3 normal and customary trade and quantity discounts actually allowed or paid, customer trade credits and allowances granted on return or rejection of Licensed Products, price adjustments or billing errors and transportation charges, provided that the aggregate of all items referred to in this Article 1.13.1.3 shall be deemed to be covered by a lump sum deduction of ten per cent (10 %).

1.13.2.4 Any price increase as a result of a Reagent Rental Agreement Plan such increase being, as of the Effective Date, a rate of 25 % (twenty-five per cent) taking into account the full cost of financing and servicing of the analyzer in accordance with RDG's general procedure for allocating such costs of the rental surcharge, which will be open to inspection by Medinnova upon request.

1.13.3    In the event that the Licensed Technology is integrated in applications which also include functions other than those relating to the Licensed Field (for example the testing of congestive heart failure on the basis of Troponin T and pro BNP), then the term "Net Sales" shall only relate to a relative portion of the actual amount invoiced for these Combination Products. In respect of Licensed Products which constitute Combination Products, the Net Sales of such Licensed Products shall be determined as follows:

1.13.3.1 Multiply the Net Sales of such Combination Product by the fraction A/(A+B), whereby A is the average selling price of such Licensed Product if sold separately and B is the total average selling price of such other products and/or such services forming part of the Combination Product if sold separately;

1.13.3.2 if the average selling price of such Licensed Product is not available as of such date, multiply the Net Sales of such Combination Product by the fraction (C - B)/C, whereby C is the average selling price of such Combination Product and B is the total average selling price of such other products and/or such services forming part of the Combination Product if sold separately;

1.13.3.3 if the total average selling price of such other products and/or such other services in the Combination Product is not available as of such date, multiply the Net Sales of such Combination Product by the fraction A/C, whereby A is the average selling price of such Licensed Product if sold separately, and C is the average selling price of such Combination Product;

- 5 -

1.13.3.4 if neither the average selling price of such Licensed Product nor the total average selling price of such other products and/or such other services in the Combination Product is available as of such date, multiply the Net Sales of such Combination Product by the fraction (C - D)/D, whereby C is the average selling price of such Combination Product and D is a reasonable value based upon the total average selling price of products and/or services available in the marketplace similar to such other products and/or services in the Combination Product.

1.14    **"Patent Rights"** shall mean any and all patents and patent applications as listed in **Annex I** to this Agreement and such other patents relating to the Licensed Technology that Medinnova may have filed prior to signature of the License Agreement by both parties, including any divisions, continuations, continuations in-part or reissues of such patents.

1.15    **"pro BNP"** shall mean the N-terminal pro brain natriuretic peptide.

1.16    **"Proprietary Rights"** shall mean the Patent Rights, the Information and any other intellectual property rights related to the Licensed Technology, including related copyrighted materials such as engineering designs, plans or drawings, computer software and related design patents.

1.17    **"Reagent Rental Agreement Plan"** shall mean a written lease or rental agreement between RDG and a Third Party pursuant to which an analyzer is placed at the Third Party for use in in vitro diagnostic applications, and where financing and servicing of such analyzer is included in the actual invoiced price of Licensed Products.

1.18    **"Territory"** shall mean all countries throughout the world.

1.19    **"Third Party(ies)"** shall mean any party other than the parties to this License Agreement and their Affiliates.

## Article 2
## Grant of License

2.1    Subject to the terms and conditions of this License Agreement, Medinnova hereby grants RDG and its Affiliates an Exclusive license to use the Licensed Technology and the Proprietary Rights, including any and all Improvements (and the related Proprietary Rights), to develop, have developed, manufacture, have manufactured, market, distribute, sell, otherwise dispose of and/or use the Licensed Products in the Licensed Field throughout the Territory, including the right to grant sub-licenses to Third Parties for such purposes.

2.2    The License includes the right to arrange for Third Parties to manufacture the Licensed Products for RDG's and/or its Affiliates' use and account provided,

however, that such Third Parties agree to use the Licensed Technology only for the manufacture of the Licensed Products or components or parts thereof ordered by RDG and/or its Affiliates and furthermore that such Third Parties agree to observe the confidentiality obligations accepted by RDG pursuant to this Agreement.

## Article 3
## Development of Licensed Products

3.1     RDG shall use commercially reasonable efforts to develop Licensed Products in such format as RDG considers suitable for commercial use. RDG shall allocate what it considers to be sufficient and reasonable resources for such development activities.

3.2     At RDG's request Medinnova shall use reasonable efforts in assisting RDG with the abovementioned development activities provided, however, that the overall responsibility for the development of Licensed Products shall be with RDG.

3.3     Promptly after the Effective Date, at RDG's request Medinnova shall transfer to RDG any and all Licensed Technology.

3.4     Medinnova shall transfer to RDG in writing any and all information related to Improvements as and when such becomes available.

3.5     For the avoidance of doubt, Medinnova's obligations pursuant to this Article shall be deemed fully remunerated by the royalty payments payable by RDG pursuant to Article 6, provided that RDG agrees to additionally remunerate Medinnova in respect of any reasonable costs and expenses incurred at RDG's request as a result of Medinnova rendering assistance pursuant to Article 3.2 over and above its obligations pursuant to all other provisions of this Agreement.

## Article 4
## Registration and Approvals

4.1     Subject to Article 3, RDG undertakes to use commercially reasonable efforts to obtain as promptly as possible all registrations and regulatory approvals for the Licensed Products which in RDG's opinion are or may become needed in order to permit the development, manufacture, marketing, distribution, sale, other disposal and/or use of the Licensed Products in such countries within the Territory as RDG shall determine.

4.2    RDG shall use commercially reasonable efforts to maintain all registrations and regulatory approvals for the Licensed Products in accordance with Article 4.1 in such countries within the Territory as RDG shall determine.

4.3    RDG shall be the sole holder of such registrations and regulatory approvals.

4.4    The costs necessary to obtain and maintain such registrations and regulatory approvals shall be borne by RDG.


## Article 5
## Improvements

### 5.1    Information on Improvements

Throughout the term of this Agreement, the parties hereto shall promptly inform each other in writing of any Improvements relating to the Licensed Technology, whether patentable or not. In the event of priority creating patent applications such written information shall be made available to the other party promptly after such application has been made.

### 5.2    Filing of Patents

A party shall be entitled to file patent applications in respect of any Improvements made by it respectively throughout the Territory in its name and at its own expense.

### 5.3    RDG's right to file Patents in respect of Improvements made by Medinnova.

In the event that Medinnova has not filed or not pursued a patent application or a patent in respect of significant Improvements made by Medinnova in any country within the Territory within ninety (90) days of a written request from RDG to do so, RDG shall be entitled to file or to pursue such patent application or patent in such country in its own name and at its own expense, and Medinnova shall, at RDG's request and expense, cooperate with and assist RDG in doing so.


## Article 6
## Royalties

### 6.1    Lump Sum Royalties

In consideration of the rights granted by Medinnova to RDG hereunder in connection with the development of Licensed Products, RDG agrees that the following lump sum royalties shall be payable to Medinnova:

6.1.1

6.1.2

6.1.3

**6.2**

6.2.1

6.2.1.1

6.2.1.2

6.2.1.3

6.2.1.4

6.2.1.5

License Agreement
between
RDG / Medinnova
Mannheim, October 21, 1999

6.2.1.6

6.2.1.7

6.2.2

6.2.3

6.2.4

License Agreement
between
RDG / Medinnova
Mannheim, October 21, 1999

- 10 -

6.2.5

6.2.6

6.3

6.4

6.5

## Article 7
### Representations and Warranties of Medinnova and RDG

7.1      Representations and Warranties of Medinnova

7.1.1    Medinnova represents and warrants that it is authorised to enter into this
         Agreement and that it is entitled to grant RDG the Exclusive License to use the

Licensed Technology in accordance with the terms and conditions of this Agreement.

7.1.2   Medinnova represents and warrants that it owns all intellectual property rights related to the Proprietary Rights and otherwise required for the purposes of this Agreement and that it has no actual knowledge of intellectual property rights of Third Parties which may be infringed by the use or development of the Licensed Technology or the development, manufacture, marketing, distribution, sale, other disposal and/or use of the Licensed Products or any other provision of this Agreement and furthermore that it has no knowledge of any facts or circumstances that may invalidate or render the Proprietary Rights unenforceable.

7.1.3   Medinnova shall inform RDG immediately in the event that Medinnova receives any information indicating that any such Third Party intellectual property rights may exist.

7.1.4   Medinnova warrants that it shall make the Licensed Technology available to RDG to the best of its ability, but makes no representation or warranty as to the value of the Licensed Technology or to the ability of RDG to make use thereof.

7.2     **Representations and Warranties of RDG**

RDG represents and warrants that RDG is authorised to enter into this Agreement and that as far as it is aware, no claim has been made by any Third Party asserting that RDG is in any way restricted from meeting its obligations contemplated hereunder. RDG furthermore represents and warrants that it has no actual knowledge of any rights of any Third Parties which may be infringed by the use, development, manufacture, marketing, distribution, sale or disposal of Licensed Products or any other provision of this Agreement.

### Article 8
### Books and Record Keeping

8.1     RDG shall keep full, true and accurate books of account containing all particulars (and in particular sales in units and local currency, stocks and distribution of free samples) and reasonable supporting documentation which may be necessary for the purpose of determining the Net Sales of all Licensed Products upon which royalties under this Agreement are based. The books of account and reasonable supporting documentation shall be kept at RDG's principal place of business and shall be open at all reasonable times for a period of five years following the end of the calendar year to which they pertain (and access shall not be denied thereafter if reasonably available) for inspection by an independent certified public accountant or auditor retained by

Medinnova and acceptable to RDG for the purpose of verifying RDG's royalty payments pursuant to Article 6.

8.2    If any such inspection discloses that in respect of any calendar year the amount of royalties paid by RDG was less than the amount actually due by ten per cent (10%) or more, RDG shall promptly pay the reasonable costs of such inspection following receipt by RDG of the invoice for such inspection.

## Article 9
## Withholding Tax

It is the parties understanding that under the existing double taxation treaty between Norway and the Federal Republic of Germany no withholding tax will be levied on royalty payments due pursuant to this License Agreement. However in the event that any withholding tax is levied on payments to be made by RDG to Medinnova in accordance with this License Agreement, such withholding tax shall be borne solely by Medinnova, and RDG shall be obliged to provide Medinnova with proper tax receipts in respect thereof. In the event that a tax exemption for withholding tax purposes is available under the applicable law, a double taxation treaty or any similar agreement in force, RDG shall use its best reasonable efforts to enable Medinnova to obtain such exemption in respect of the payments due in accordance with this License Agreement.

## Article 10
## Intellectual Property Rights

**10.1    Maintenance of Patents**

10.1.1    Subject to Article 10.2.2, RDG shall at its own cost be responsible for maintaining all the Patent Rights. In the event that RDG chooses to file patent applications in respect of Improvements made by RDG pursuant to Article 5.2 or Improvements made by Medinnova pursuant to Article 5.3, to the extent that RDG wishes within its sole discretion to maintain such patents, RDG shall be responsible therefor and bear the costs thereof.

10.1.2    RDG shall be entitled to credit and deduct fifty per cent of all costs incurred in connection with maintaining the Patent Rights pursuant to Article 10.1.1 from any and all sums payable by RDG under Article 6.2 over and above the minimum royalty payments payable pursuant to Articles 6.2.1.5 to 6.2.1.7.

10.1.3   For the avoidance of doubt, Medinnova shall at its own cost be responsible for completing the filing of all applications relating to the Patent Rights in the countries listed in Annex I (including, but not limited to, any and all examination fees due in respect thereof).

**10.2    Patent Infringement**

**10.2.1   Defence of Patent Infringements**

The parties shall notify each other accordingly upon becoming aware of any relevant information regarding any infringement, imminent infringement or any other occurrence affecting any Patent Rights or any patents in respect of Improvements without delay.

**10.2.2   Medinnova's Right to take Legal Action**

Subject to Article 10.2.3, Medinnova shall at its own expense be primarily responsible for enforcing any and all Patent Rights and any patents in Medinnova's name in respect of Improvements and for prosecuting any and all infringements thereof by any and all means which Medinnova considers suitable for such purposes.

**10.2.3   RDG's Right to take Legal Action**

In the event that after a reasonable period of time (and in any event after a period of two (2) months) of being requested by RDG to do so, Medinnova fails to terminate a Third Party infringement of any Patent Rights or to prosecute the alleged infringor or otherwise with best efforts seeks to enforce such Patent Rights, RDG shall be entitled to take such action as it reasonably considers necessary to enforce such Patent Rights and terminate any Third Party infringement thereof, and, in the event that a court or any settlement or other agreement determines that such Third Party has infringed any Patent Rights all costs so incurred by RDG shall be reimbursed by Medinnova.

**10.2.4   General Provisions**

10.2.4.1 In any proceedings relating to Patent Rights pursuant to Article 10, the party taking action shall be provided with all reasonable assistance from the other party.

10.2.4.2 In the event that either party takes any action pursuant to this Article 10, the other party shall be entitled to join the proceedings in its own name and to be represented at its own expense by counsel of its own choosing.

10.2.4.3 The party taking any legal action pursuant to this Article 10 shall be entitled to control the same and to retain all monetary damages, recovery and costs awarded thereon, provided however that where Medinnova has taken such legal action but RDG has suffered loss or detriment as a result of such action

of the cause thereof, Medinnova shall be obliged to compensate RDG for such loss or detriment from any monetary damages or costs awarded.

**10.3    Defence against Third Parties' Patent Claims**

**10.3.1    Mutual Information**

The parties shall notify each other accordingly if a claim or proceedings are brought against either party alleging that the development, manufacture, marketing, distribution, sale, other disposal or use of the Licensed Products under the Licensed Technology infringes upon any patent rights of a Third Party.

**10.3.2    Defence of Third Party Action brought against RDG; Indemnification of RDG**

10.3.2.1 If a claim or proceedings are brought against RDG alleging that the development manufacture, marketing, distribution, sale, other disposal or use of any Licensed Products as a result of the Licensed Technology infringes upon the patent rights of a Third Party, RDG's obligations to pay royalties pursuant to Article 6.2 shall be suspended until the settlement or judgement, as the case may be, of such claim or proceedings and the parties shall immediately consult on how to proceed further, provided however that RDG alone shall be entitled to determine whether or not and, as the case may be, how to defend or settle such claim or proceedings. Medinnova shall have the right to join any such proceedings as a party at its own expense by counsel of its own choosing.

10.3.2.2 Medinnova shall indemnify and hold RDG harmless against any claim or proceedings pursuant to Article 10.3.2.1, including reasonable legal fees provided however that any obligation to indemnify shall be excluded if RDG fails to immediately notify Medinnova of the assertion of any such claims, and/or if RDG recognises or settles part or all of any such claims without having previously consulted with Medinnova. Furthermore, in the event that it is determined that any Third Party patent rights are infringed, Medinnova shall be obliged to reimburse RDG in respect of any royalty payments received from RDG pursuant to Article 6.1.

10.3.2.3 Articles 10.3.2.1 and 10.3.2.2 shall not apply to the extent that any claims or proceedings relate to Improvements made by RDG.


**Article 11
Confidentiality, Publications**

11.1    Each party hereto agrees to hold in strict confidence any and all Information and/or other Licensed Technology disclosed pursuant to this Agreement and clearly marked to be confidential and to restrict access to such Information

and/or other Licensed Technology to persons entrusted to carry out the activities provided for hereunder who are subject to an analogous confidentiality obligation. Each party agrees to clearly mark as confidential any and all Information or Licensed Technology which it makes available to the other party which the disposing party considers to be confidential. Each party furthermore agrees to reduce to writing any such confidential Information or Licensed Technology which it discloses orally and to provide the receiving party with a copy thereof within thirty (30) days of the date of the oral disclosure.

11.2    The confidentiality obligations pursuant to Article 11.1 shall not apply to Information and/or Licensed Technology which:

11.2.1   is in the public domain at the time of its disclosure;

11.2.2   is published or otherwise becomes part of the public domain through no fault of the receiving party or becomes available from a Third Party who has the right to disclose it;

11.2.3   was in the possession of the receiving party at the time of its disclosure as shown by prior written records; or

11.2.4   was or will be independently developed by employees of the receiving party who had no access to the Information disclosed.

11.3    Publications by Medinnova, its directors, employees and staff relating to the Licensed Technology shall only be permissible with RDG's prior written consent. A copy of any and all publications by RDG, its directors, employees and / or staff relating to the Licensed Technology and / or Licensed Products shall be provided to Medinnova prior to their publication, and RDG shall give reasonable consideration to any comments received from Medinnova within five days, but shall not be obliged to incorporate any such comments.


### Article 12
### Term and Termination

**12.1    Term**

This License Agreement shall come into force on the Effective Date and, unless otherwise terminated in accordance with Article 12.2 or Article 12.3, shall expire upon the expiry of the last to expire Patent Rights.

**12.2    Termination**

Each party shall have the right to terminate this Agreement by giving the other party thirty (30) days notice if the other party files a declaration of bankruptcy or enters into any arrangement or composition with creditors, or goes into liquidation, whether voluntarily or compulsorily.

**12.3    Termination by Medinnova**

Medinnova shall have the right to terminate this Agreement forthwith:

12.3.1  if RDG fails to pay any of the payments due pursuant to Article 6 and if any such payment is not transferred within ninety (90) days of receipt of notice from Medinnova following the respective due date of payment; or

12.3.2  if ownership or control of RDG is transferred to a Third Party, whether by purchase, merger, operation of law or otherwise and such transfer negatively affects Medinnova's reasonable interests, provided that Medinnova hereby agrees that any changes in ownership or control directly relating to internal restructuring of F. Hoffmann-La Roche or any of its Affiliates shall not entitle Medinnova to terminate this Agreement.

**12.4    Termination by RDG**

12.4.1  RDG shall have the right to terminate this Agreement forthwith:

12.4.1.1 if Medinnova fails or becomes substantially unable to perform any of its obligations or undertakings to be performed under this License Agreement and such default is not cured within ninety (90) days or such longer period as RDG within its discretion may determine, of receipt of a written notice from RDG specifying the nature of the default; or

12.4.1.2 if ownership or control of Medinnova is transferred to a Third Party, whether by purchase, merger, operation of law or otherwise and such transfer negatively affects RDG's reasonable interests.

12.4.1.3 if it has been established by final court decision that any of the Licensed Technology constitutes an infringement of Third Party intellectual property rights in either Australia, Canada, Japan, the United States of America or any European country.

12.4.2  In the event that RDG terminates this Agreement in accordance with Article 12.4.1.3, Medinnova shall be obliged to reimburse RDG in respect of all sums received from RDG pursuant to Article 6 above.

12.4.3  RDG shall be entitled to terminate this Agreement by giving Medinnova thirty days notice in any of the following circumstances:

12.4.3.1 if during the development phase of Licensed Products in accordance with Article 3 the costs of the development of Licensed Products are materially higher than anticipated by RDG, and if within RDG's reasonably exercised discretion, RDG cannot under such circumstances be expected to continue the development of Licensed Products, or if, within RDG's reasonably exercised discretion, it appears that the development of Licensed Products is not possible due to scientific or technical reasons;

12.4.3.2 if, in RDG's reasonable opinion, during the development phase of Licensed Products or at any time thereafter, the position of Licensed Products in the market place and the economic data relating to Licensed Products changes so significantly as to render it unreasonable for RDG to continue developing and/or manufacturing, marketing and/or selling Licensed Products; or

12.4.3.3 if at any time, in RDG's reasonable opinion, the circumstances are such that it would no longer be technically or commercially reasonable to continue developing, manufacturing, marketing or selling the Licensed Products.

## Article 13
## Rights and Duties of the Parties upon Termination

**13.1    Termination of Marketing Activities**

In the event that Medinnova terminates this Agreement in accordance with Article 12.2 or Article 12.3, RDG shall thereafter refrain from manufacturing, distributing, marketing, using or selling the Licensed Products, provided however that RDG shall be entitled to sell all existing stocks of Licensed Products.

**13.2    Return of Documents and Information**

In the event that Medinnova terminates this Agreement in accordance with Article 12.2 or Article 12.3, or RDG terminates this Agreement in accordance with Article 12.4, at Medinnova's request RDG shall return to Medinnova all information relating to the Licensed Technology, whether stored on electronic databases or otherwise provided that RDG shall be entitled to retain one copy of all Information for its files.

**13.3    Outstanding Payments**

Payments to be made by either party under this Agreement shall become due at the latest ninety (90) days after the expiry or termination of this Agreement provided that the amount of such payments can be determined at such time. If this is not the case, such payments shall become due as soon as the amount can be determined and such amount is correctly billed to the other party.

**13.4    Survival of Obligations**

The termination of this Agreement for any reason whatsoever shall be without prejudice to any obligations or rights on the part of either party which have accrued prior to such termination and shall not affect or prejudice any provision of this License Agreement which is expressly or impliedly provided to come into effect on, or continue in effect after, such termination.

- 18 -

## Article 14
## Governing Law and Jurisdiction

### 14.1   Governing Law

This Agreement shall be construed in accordance with and governed by the laws of Sweden.

### 14.2   Arbitration

Any dispute or claim arising out of or in connection with this Agreement shall be finally settled by binding arbitration in Stockholm, Sweden under the rules of arbitration of the Arbitration Institute of the Chamber of Commerce in Stockholm, by three arbitrators appointed in accordance with this Section 14.2. Each party shall select one such arbitrator, and the two arbitrators so chosen shall select the third arbitrator. Place of arbitration shall be Stockholm and the arbitration shall be held in English.

## Article 15
## Miscellaneous Provisions

### 15.1   Previous Agreement

This Agreement supersedes and replaces all previous agreements entered into between the parties hereto covering the subject matter hereof, including the Option Agreement

### 15.2   Assignment

Each of RDG and Medinnova shall be entitled to assign its respective rights and duties and this Agreement in whole or in part to one or more of their respective Affiliates.

### 15.3   Force Majeure

Neither party shall be responsible or liable for any delay or failure in the performance of its duties under this Agreement if such delay or failure is due to any cause beyond its control, such as, but not limited to, fire, floods, earthquakes, storms, acts of God, acts of war, strikes, lock-outs, civil commotions, industrial conflicts and the like.

### 15.4   Failure and Estoppel

Failure of any party to insist upon a strict and punctual performance of any of the provisions hereof shall not constitute a waiver nor an estoppel against asserting the right to require such performance, nor shall a waiver or estoppel in one instance constitute a waiver or estoppel with respect to a later breach,

- 19 -

whether of a similar nature or otherwise. Nothing in this Agreement shall prevent a party from enforcing its rights under this Agreement by such remedies as may be available under law.

### 15.5    Severability

All stipulations contained in this Agreement shall be so construed as not to infringe the provisions of any applicable laws, but if any such stipulation does infringe any such provision, the same shall be deemed to be void and severable and shall be replaced by an appropriate provision conforming to such law and reflecting the economical intentions of the parties hereto. In the event that the terms and conditions of this Agreement are materially altered as a result, the parties shall renegotiate the terms and conditions of this Agreement in order to resolve any inequities.

### 15.6    Modifications and Amendments

This Agreement and any modifications or amendments thereto may be executed in counterparts which together shall constitute one document.

### 15.7    Notices

Any notice required or permitted to be given under or in connection with this Agreement or the subject matter hereof shall be given by first class air mail, telex or telefax to the recipient at the following address, or to any other address as may have been furnished in writing by the recipient to the sending party for such purposes. Any such aforementioned notice or request shall be effective upon receipt by the party to which it is addressed, provided that any notice sent by first class air mail shall be deemed received within five working days of posting and any notice sent by telex or telefax shall be deemed received within one working day of being telexed or telefaxed, as the case may be.

RDG:                    Roche Diagnostics GmbH
                        Sandhofer Strasse 116
                        68305 Mannheim
                        Federal Republic of Germany
                        Fax.:   +49-(0)621-759-6242
                        Phone: +49-(0)621-759-6540
                        Attn.:   Licensing and Legal Department

Medinnova:              Medinnova SF
                        Rikshospitalet
                        0027 Oslo
                        Norway
                        Fax.:   + 47 22 86 84 95
                        Phone:+ 47 22 86 83 96
                        Attn.:   Managing Director

Mannheim, .22.10.1999                          Mannheim, 22.10.1999

Roche Diagnostics GmbH                         Medinnova SF

ppa.                    i. V.

Dr. H. Ortanderl         P. Homberg            Dr. L. Wik
(Vice President/         (Senior Director/     (President)
Licensing/Extern. Coop.) Legal Counsel)

- 21 -

ANNEX I

**Patent Rights**

| Country | Application No | Serial/Publication No | Status |
|---|---|---|---|
| Australia | 43405/93 | 667223 | Granted |
| Canada | 2136961 | | Pending, examin. fee due 2.6.2000 |
| Japan | 93/0500364 | | Pending, examin. fee due 2.6.2000 |
| United States | 338558 | | Accepted for issue - Allowance expected |
| European (EPO) | 93913278.3 | 0648228 | Allowance expected |

# EXHIBIT "C"



(19) Europäisches Patentamt
European Patent Office
Office européen des brevets

(11)    **EP 0 648 228 B1**

(12)    **EUROPEAN PATENT SPECIFICATION**

(45) Date of publication and mention
of the grant of the patent:
**04.11.1998 Bulletin 1998/45**

(51) Int Cl.[6]: **C07K 16/26**, C07K 14/575,
C12P 21/08, G01N 33/577,
G01N 33/68

(21) Application number: 93913278.3

(22) Date of filing: 02.06.1993

(86) International application number:
**PCT/GB93/01173**

(87) International publication number:
**WO 93/24531 (09.12.1993 Gazette 1993/29)**

(54) **BNP ANTIBODY AND IMMUNOASSAY USING IT**

BNP ANTIKÖRPER UND IMMUNOLOGISCHER NACHWEIS DER IHN BENUTZT

ANTICORPS DU BNP ET IMMUNO-DETECTION LES UTILISANT

(84) Designated Contracting States:
**AT BE CH DE DK ES FR GB IE IT LI LU NL SE**

(30) Priority: 03.06.1992 GB 9211686

(43) Date of publication of application:
**19.04.1995 Bulletin 1995/16**

(73) Proprietor: **MEDINNOVA SF**
**0027 Oslo (NO)**

(72) Inventors.
• **HALL, Christian**
**N-1335 Snaröya (NO)**
• **Dzieglewska Hanna, Eva**
**Micham Surrey CR4 3NZ (GB)**

(74) Representative: Dzieglewska, Hanna Eva et al
Frank B. Dehn & Co.,
European Patent Attorneys,
179 Queen Victoria Street
London EC4V 4EL (GB)

(56) References cited:
EP-A- 0 385 476

• **JAPANESE PATENTS ABSTRACTS
(UNEXAMINED)** Section Ch, Week 9207, Derwent
Publications Ltd., London, GB; Class CH, AN
92-053618
• **CHEMICAL ABSTRACTS**, vol. 114, no. 25, 24
June 1991, Columbus, Ohio, US; abstract no.
240736k, TOGASHI, KAZUYOSHI ET AL. 'A
specific and highly sensitive radioimmunoassay
of human brain natriuretic peptide' page 108
;column L ;
• J. CLIN. INVEST. vol. 87, no. 4, April 1991, AM.
SOC. CLIN. INVEST., pages 1402 - 1412 M.
MUKOYAMA ET AL. 'Brain natriuretic peptide as
a novel cardiac hormone in humans' cited in the
application

**EP 0 648 228 B1**

Note: Within nine months from the publication of the mention of the grant of the European patent, any person may give notice to the European Patent Office of opposition to the European patent granted. Notice of opposition shall be filed in a written reasoned statement. It shall not be deemed to have been filed until the opposition fee has been paid. (Art. 99(1) European Patent Convention).

1                          EP 0 648 228 B1                          2

## Description

This invention relates to the N-terminal section of Brain Natriuretic Peptide Prohormone, BNP(1-76) and the use of antibodies against this in immunoassays in biological fluids for the purpose of biological research and medical diagnosis, for example of heart failure or hypervolaemia.

Heart failure is a common clinical syndrome especially among elderly people. Population surveys indicate that the condition affects about 2% of the total population in the western world. The syndrome usually presents itself with an insidious onset with unspecific symptoms such as dyspnea on exertion, fatigue and peripheral oedemas. To establish the diagnosis the physician usually must either rely on his clinical experience or refer the patient to a cardiological center for echocardiography, radionuclide scanning, exercise testing or catheterization.

Heart disease represents a significant drain on health resources in many major countries, and whilst an early diagnosis may help in controlling the condition and preventing rapid progression to severe heart failure, it would obviously be preferable to be able to identify those patients in which heart failure is likely to occur before it actually does so, ie. to prognose rather than to diagnose.

Unfortunately, there are at present no completely satisfactory methods for predicting the likelihood of heart failure. Problems frequently observed with such methods are insufficient accuracy and sensitivity, and the disadvantages of the necessity for expensive equipment requiring specially trained personnel (eg. in echocardiography). A need therefore exists for a simple method of accurately and sensitively, not only diagnosing, but also predicting the likelihood of onset of heart failure.

Whilst heart failure can be defined as a symptomatic state ie. an overt disease or syndrome, patients may frequently pass through a state of asymptomatic cardiac dysfunction ie. a sub-clinical condition without overt symptoms, before heart failure manifests itself. However, we have now found that not all patients having cardiac dysfunction go on to develop severe heart failure, and that the risk of heart failure for some such people is much greater than for others. To be able to identify those people at particular risk of developing heart failure in order that they may be caught and treated before heart failure occurs would be of great clinical importance; at the moment existing treatments eg. ACE inhibitors are very expensive and it is not cost-effective for everyone to be treated to try to prevent the onset of heart failure.

Brain Natriuretic Peptide (BNP) is a polypeptide originally isolated from porcine brain by T. Sudoh and coworkers (Nature 1988; 332: 78-81). After cloning and sequence analysis of cDNA coding for the peptide (T. Sudoh BBRC 1989; 159: 1427-34) human BNP was shown to be produced in the human heart. Human Brain Natriuretic Peptide is believed to be produced in cardiac myocytes as a prohormone (proBNP or BNP(1-108)). proBNP consists of 108 amino acids and is split, before or during secretion, at amino acids Arg76 -- Ser77 into BNP and the N-terminal part of the prohormone, BNP (1-76), that is the peptide consisting of the first 76 amino acids from the N-terminal of proBNP.

The BNP(77-108) plasma concentration is increased in patients suffering from heart disease leading to heart failure. The cardiac monocytes secrete another factor, namely atrial natriuretic factor (ANF) but the secretory response to heart failure or incipient heart failure seems to be much larger in the BNP system compared to the ANF system (Mukoyama et al, J Clin Invest 1991; 87: 1402-12).

The present invention is based on the concept that human BNP(1-76), due to a long half-life as compared with BNP hormone itself and high initial concentration, is a particularly good diagnostic indicator or predictor of heart disease and also of hypervolaemia.

Human BNP(1-76) may thus be used to provide the basis of either a diagnostic or a prognostic test for heart failure, primarily in the biosynthesis of antibodies for use in such a test but also as competing antigen in competitive binding immunoassays. For such use in making antibodies BNP(1-76) or an antigenic fragment thereof may advantageously be conjugated to an immunogenic protein or peptide such as PPD, a protein derivative of tuberculin, Keyhole Limpet Haemocyanin or bovine serum albumin.

Thus human BNP(1-76) or an antigenic fragment thereof or polypeptide extension thereof lacking BNP activity and having at least one antigenic epitope of human BNP(1-76), conjugated to one or more immunogenic polypeptides, constitutes one aspect of the present invention; these polypeptides may be used to make either polyclonal or monoclonal antibodies specific to BNP(1-76). Such monoclonal and polyclonal antibodies constitute two further aspects of the invention.

According to a still further aspect of the invention we provide a method of immunoassay for human BNP (1-76) or an antigenic fragment thereof or polypeptide extension thereof lacking BNP activity wherein the primary binding partner therefor is a monoclonal or polyclonal antibody according to the invention. Methods of immunoassay are of course well known in the art eg. RIA, ELISA, fluorescence immunoassay (FIA) or dry chemistry test strip immunoassays. Such an immunoassay will, in general, use a monoclonal or polyclonal antibody according to the invention in immobilised form, eg. on microtitre plates, membranes or beads, to isolate the target BNP(1-76) compound. In a sandwich assay, the bound antigen may be labelled using additional soluble antibody according to the invention, which may be monoclonal or polyclonal and which may either carry a label or, more conveniently, may itself be labelled subsequently by reaction with a secondary antibody carrying a label.

Thus, if the primary antibody according to the invention is raised in mice or rabbits, the labelled secondary antibody may be an anti-mouse or anti-rabbit antibody.

Suitable labels include radionucleides, fluorescent substances eg. europium based fluorogens, enzymes, for example as used in ELISA systems employing automated hybrid methods or dyes or coloured particles such as colloidal gold.

Alternatively, a competitive binding assay may be used, wherein a known quantity of labelled human BNP (1-76), or antigenic fragment or inactive extension thereof, is added to the analyte solution and contacted with a limited quantity of the immobilised monoclonal or polyclonal antibody, whereby the amount of labelled antigen which is immobilised is inversely proportional to the amount of target antigen present in the analyte.

The invention thus extends to labelled forms of human BNP(1-76) or antigenic fragments or polypeptide extensions thereof lacking BNP activity or to labelled forms of the antibodies of the invention.

The invention also comprises a kit for immunoassay of human BNP(1-76) or an antigenic fragment or polypeptide extension thereof lacking BNP activity comprising:

(a) a monoclonal or polyclonal antibody according to the invention in immobilised form and, at least one further component selected from;

(b) a labelled sample of BNP(1-76) or an antigenic fragment or polypeptide extension thereof lacking BNP activity;

(c) said monoclonal or polyclonal antibody in non-immobilised form;

(d) a labelled secondary antibody specific to said antibody (c).

Such an immunoassay and kit may be used in research into related biological systems as well as for diagnosis or prognosis of conditions wherein the human BNP(1-76) level in body fluids is a diagnostic or predictive indicator.

The invention also comprises a method of diagnosis or prognosis of a condition in which the concentration of human BNP(1-76) or an antigenic fragment or polypeptide extension thereof lacking BNP activity is a diagnostic or predictive indicator, wherein a body fluid of a patient is subjected in vitro to immunoassay to detect or assay the presence or quantity therein of human BNP (1-76).

We have recently found that another natriuretic factor namely pro-ANF, and in particular N-terminal pro-ANF, can serve as an indicator of risk of heart failure in patients lacking overt symptoms of heart failure. The level of pro-ANF in body fluids can be directly related to the risk of heart failure, predominantly related to increased atrial pressure. In contrast, BNP(1-76) is predominantly an indication of a heart condition related to increased ventricular pressure. Human BNP(1-76) as

an antigenic fragment or inactive polypeptide extension thereof can also be used to assess risk of heart failure in addition to its use in diagnosis of actual heart failure. Furthermore, assay of both N-terminal pro-ANF and BNP(1-76) in body fluids can assist in determining whether atrial or ventricular pressure is concerned.

Thus, the immunoassay can be used in the monitoring of heart failure treatment. Such treatment is aimed at reducing the hypervolemia and excessive vasoconstriction seen in heart failure by the administration of diuretics and vasodilators. By decreasing the pressure in the cardiac chambers such treatment will lower cardiac production of BNP(1-76). The resultant decrease in plasma BNP(1-76) concentration serve to inform the physician of a significant drug effect. On the contrary, an increase in plasma BNP(1-76) indicates that an adjustment of dosage might be necessary.

Although less well documented at this time human BNP(1-76) may also be used as a diagnostic tool in the diagnosis of hypervolemia without heart failure. The immunoassay therefore has potential use also in the in-hospital intensive care setting where monitoring of volume status is essential.

The body fluid on which the immunoassay is performed may be any body fluid in which the human BNP (1-76) is located, but conveniently will be plasma or serum. In some cases it may be convenient to extract the peptide, or otherwise treat the sample prior to assay.

The human BNP(1-76) peptide or an antigenic or immunogenic fragment thereof may be produced by synthesis from its constituent amino acids or by assembly of pre-synthesised blocks of amino acids using techniques well known in the art. Where labelled material is required, the label may be introduced by standard techniques.

For the purpose of raising monoclonal or polyclonal antibodies, the human BNP(1-76) or antigenic fragment thereof may be conjugated to an immunogenic protein or peptide, for example PPD, a protein derivative of tuberculin, eg. using 1-ethyl-3-(3-dimethylaminopropyl) carbodiimide according to the method of Staros et al (Analyte Biochem 1986; 156: 220-222).

The antibodies of the invention may be made by injecting a host animal, eg. a mouse or rabbit, with the BNP antigen of the invention, advantageously a conjugate with an immunogenic protein as described above, to provide either a serum containing polyclonal antibodies or spleen cells for conversion to hybridomas or immortalised cell lines producing monoclonal antibodies.

The following Examples are given by way of illustration only with reference to the accompanying drawing in which:

Figure 1 shows a standard curve for immunoassay for BNP(1-76) using synthetic BNP(47-64) as immunogen, standard and tracer, and polyclonal rabbit antibody. (Abscissa shows BNP(47-64) pmol/l; ordinate shows % binding (B/B(O))).

5                         EP 0 648 228 B1                         6

## Example 1

**Production of monoclonal antibody against BNP (1-76)**

1) Conjugation

Three synthesized fragments of BNP(1-76): BNP(1-21), BNP(22-46) and BNP(47-64) were acquired from Peninsula laboratories and conjugated to PPD (protein derivative of tuberculin) according to Staros et al (Analyt Biochem 1986; 156: 220-222).

2) Immunization

Balb C mice, preimmunized with BCG antigen were utilized. The mice received a 50 microgram mixture of the three conjugates in 200 μl of Freunds incomplete adjuvant. The mixture was given in 2 x 200 μl injections on 2 occasions 2 weeks apart. 2 weeks after the last injection 50 μg of conjugate mixture in saline was injected intraperitoneally.

3) Fusion

3 days after intraperitoneal immunization mouse splenic cells were fused with SP 2/0 myeloma cells and the resultant hybridomas selected in HAT medium. The suspension of hybridomas was distributed in 960 wells in Dulbeccos medium enriched with 10% human endothelial cell supernatant.

4) Screening

Method 1

Costar microtiter plates were coated with a mixture of the synthetic BNP peptide sequences (0.5 μg/ml). Supernatants were then added and binding of antibody from supernatants was screened by ELISA through the addition of anti mouse IgG conjugated to horseradish peroxidase enzyme followed by substrate solution (OPD).

Method 2

An alternative method of screening is to coat Greiner microtiter plates with goat anti mouse IgG (1.0 μg/ml). Supernatants are then added and incubated. Biotinylated synthetic BNP peptide sequences are added and the ability of supernatants to bind peptide are screened by ELISA through the addition of streptavidin-conjugated horseradish peroxidase enzyme followed by substrate solution (OPD).

5) Cloning

Hybridomas producing antibodies to the peptide mixture were cloned and subcloned in two runs.

Clone 1C7 was shown to react with peptide sequence BNP(47-64). This clone was grown and the supernatant utilised in immunoassay for BNP (1-76).

## Example 2

**Immunoassay for BNP(1-76)**

The 1C7 antibody can be utilised in various types of immunoassays for BNP(1-76). These include

a) Radioimmunoassay (RIA)
b) Europium Fluorescence immunoassays (FIA)
c) Enzyme linked immunosorbent assays (ELISA) including automated hybrid methods running on micro titer plates or membranes
d) Various dry-chemistry test strip immunoassays

The following is an example of a sandwich ELISA. Costar microtiter plates are precoated with the 1C7 antibody. Sample or standard is added to the wells and after 2 hours of incubation the wells are washed and a secondary antibody (polyclonal or monoclonal) towards BNP(1-76) is added. Again after 2 hours a horseradish peroxidase-labelled anti mouse (rabbit) antibody is supplied and finally after the addition of 0-phenylenediamine substrate the colour is read in a platereader.

## Example 3

**Immunoassay for BNP(1-76) utilizing polyclonal rabbit antibody**

A synthetic peptide subsequence of BNP(1-76), in this case BNP(47-64), was conjugated to PPD according to Staros et al. (Supra). Rabbits were BCG vaccinated and then repeatedly immunized with the conjugated peptide.

Iodination ($^{125}$I) of synthetic BNP(47-64), with a tyrosine group added at the N-terminal end, was done by the chloramine-T method as follows:

Chloramine-T Method

1) 5 μg of the synthetic peptide was reconstituted with 20 μl sodiumphosphate buffer (0.25 M, pH 7.5).

2) Approximately 5 μl of $^{125}$-I was added (0.5 mCi).

3) 5 μl of chloramine-T (1 mg/ml) was added and incubated for 45 seconds.

4) 5 μl of sodiummetabisulphite (1 mg/ml) was added and incubated for 45 seconds.

5) The mixture was then fractionated on a column with Sephadex G10.

4

7                            EP 0 648 228 B1                            8

6) The fractions were counted with a gamma-counter, and the fraction/fractions with highest counts per minute (cpm) were selected as tracer for use in the RIA methods.

Sample or standards (BNP[47-64]), together with tracer (iodinated BNP(47-64)) and polyclonal antibody from rabbit serum, are mixed in polystyrene assay tubes. After 48 hours of incubation at 4°C, normal serum from rabbit, and goat anti-rabbit IgG are added. After 2 hours of incubation, polyethyleneglycol (PEG) is added and the samples are centrifuged. The supernatant is removed and the counts per minute (cpm) in precipitate are measured with a gammacounter. An example of a standard curve obtained by this type of assay is shown in Figure 1.

## Claims

1. Antibodies for use in a method of immunoassay being antibodies specific to the polypeptide comprising amino acids 1-76 of the N-terminal of human pro-brain natriuretic factor (BNP(1-76)).

2. Antibodies as claimed in claim 1 being monoclonal antibodies.

3. Antibodies as claimed in claim 1 being polyclonal antibodies.

4. Antibodies as claimed in any of claims 1 to 3 carrying a label.

5. Antibodies as claimed in claim 1 in which the label is a radionuclide, a fluorescent substance, an enzyme, a dye or coloured particles.

6. Antibodies as claimed in any of claims 1 to 5 in immobilised form.

7. A method of immunoassay for human BNP(1-76) or an antigenic fragment thereof, or polypeptide extension thereof lacking BNP activity, wherein the primary binding partner therefor is a monoclonal or polyclonal antibody according to any one of claims 1 to 6.

8. A method as claimed in claim 7 in which the antibody is immobilised as microtitre plates, membranes or beads.

9. A method as claimed in claim 8 in which a secondary antibody against human BNP(1-76) is used in a sandwich assay and is labelled before or after reaction with human BNP(1-76).

10. A method as claimed in claim 9 in which a known quantity of labelled human BNP(1-76) or an antigenic fragment thereof or polypeptide extension thereof lacking BNP activity is added to an analyte solution and contacted with a limited quantity of immobilised antibody against human BNP(1-76) to provide a competitive binding assay.

11. Labelled human BNP(1-76) or an antigenic fragment thereof or polypeptide extension thereof lacking BNP activity.

12. Human BNP(1-76) or an antigenic fragment thereof or polypeptide extension thereof lacking BNP activity and having at least one antigenic epitope of human BNP(1-76), conjugated to one or more immunogenic polypeptides.

13. A kit for immunoassay of human BNP(1-76) or an antigenic fragment or polypeptide extension thereof lacking BNP activity comprising:

    (a) a monoclonal or polyclonal antibody according to any one- of claims 1 to 6 in immobilised form and, at least one further component selected from;
    (b) a labelled sample of human BNP(1-76) or an antigenic fragment or polypeptide extension thereof lacking BNP activity;
    (c) said monoclonal or polyclonal antibody in non-immobilised form:
    (d) a labelled secondary antibody specific to said antibody (c).

14. A method of diagnosis or prognosis of a condition in which the concentration of human BNP(1-76) or an antigenic fragment or polypeptide extension thereof lacking BNP activity is a diagnostic or predictive indicator, wherein a body fluid of a patient is subjected in vitro to immunoassay to detect or assay the presence or quantity therein of human BNP (1-76).

15. A method for the production of an antibody as claimed in claim 1 wherein human BNP(1-76) or an antigenic fragment or polypeptide extension thereof lacking BNP activity, if necessary conjugated to an immunogenic protein or polypeptide, is injected into a non-human host animal to provide a serum containing a polyclonal antibody or spleen cells which are subsequently converted to hybridomas or immortalised cell lines producing monoclonal antibodies.

## Patentansprüche

1. Antikörper zur Verwendung in einem Immunoassay-Verfahren, wobei die Antikörper spezifisch sind

# CIVIL COVER SHEET    03 - 80 201

CIV - FERGUSON, JR.

UNITED STATES MAGISTRATE JUDGE

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

SYN-X PHARMA U.S.A., LLC,

**DEFENDANTS**

ROCHE DIAGNOSTICS, GmbH and
ROCHE DIAGNOSTICS CORPORATION,

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Palm Beach
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

MAR 14

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
McHale & Slavin, P.A., 4440 PGA Blvd.,
Suite 402, Palm Beach Gardens, FL 33410
561-625-6575

ATTORNEYS (IF KNOWN)

CLERK, USDC / SDFL / WPB

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:  DADE,  MONROE,  BROWARD,  PALM BEACH,  MARTIN,  ST. LUCIE,  INDIAN RIVER,  OKEECHOBEE HIGHLANDS

**II. BASIS OF JURISDICTION**  (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN**  (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

**V. NATURE OF SUIT**  (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – Med. Malpractice | B☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury – Product Liability | B☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **A PROPERTY RIGHTS** | B☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | **PERSONAL PROPERTY** | B☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 370 Other Fraud | ☐ 650 Airline Regs | ☒ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| B☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | ☐ 690 Other | | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | **A LABOR** | **B SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | B☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| S☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | B☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | A☐ 535 Death Penalty | | | ☐ 890 Other Statutory Actions |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | B☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. Security Act | A☐ 871 IRS – Third Party 26 USC 7609 | A OR B |
| ☐ 290 All Other Real Property | | A☐ 550 Civil Rights | | | |
| | | B☐ 555 Prison Condition | | | |

**VI. CAUSE OF ACTION**  (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

USC Section 2201; 35 USC Section 271 Declaratory Judgment for Patent Invalidity and Non-Infringement

LENGTH OF TRIAL via 10 days estimated (for both sides to try entire case)

**VII. REQUESTED IN COMPLAINT:**
CHECK IF THIS IS A CLASS ACTION ☐ UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ YES ☒ NO

**VIII. RELATED CASE(S)** (See instructions):
IF ANY
JUDGE _____   DOCKET NUMBER _____

DATE  3/14/03
SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # 717921   AMOUNT 150.00   APPLYING IFP _____   JUDGE Hurley   MAG. JUDGE Lynch